ANWAR A. AALAAM
c/o Anwar A Aalaam
100 Brook Meade Drive
Statesville, North Carolina [28625]
Phone Number (916) 365-5291
Email: anwar.aalaam@gmail.com

**FILED**
Statesville, NC

MAY 20 2024

Clerk, US District Court
Western District of NC

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE, NORTH CAROLINA

ANWAR A. AALAAM - VESSEL
c/o Anwar A. Aalaam - Living Man

    Plaintiff(s),

v.

MOVEMENT MORTGAGE, LLC as Lender and/or its successors, individually, and in their official capacity, an *ens legis* being used to conceal fraud,

    Defendant(s).

Case No.: 5:24 cv 127-KB-WCM

**ORIGINAL COMPLAINT FOR:**

I. FRAUD IN THE FACTUM PER UCC § 3-305(a)(1)(iii)
II. UNCONSCIONABLE CONTRACT UNDER UCC §2-302
III. CONVERSION PER UCC § 3-420
IV. RECOUPEMENT AND DISGORGEMENT OF WRONGFUL GAINS PER UCC § 3-305(3)

**Jury Trial Demanded**
**Reserve the Right to Amend**
**Requesting Hearing In Equity**

Judge:
Dept:
Action Filed:
Trial Date:

## COMPLAINT

**COMES NOW,** Anwar Aalaam (hereinafter Plaintiffs and/or Anwar) proceeding in *propria persona*, and files their amended civil lawsuit *ex equitate* aforementioned for the real property and description located at 100 Brookmeade Dr., Statesville, NC [28625]. "**TRACT I: BEING ALL** of Lot No. 1 of the development of Mr. and Mrs. R. A. Lowery, known as

"BROOKMEADE, SECTION NO. 1," as the same is platted, planned and recorded in Plat Book 7, Page 10, Iredell County Registry. PIN: 4765-23-0088:

Plaintiffs hereby allege as follows:

## INTRODUCTION

This action is a civil action filed jointly by Anwar Aalaam, a married man, (hereinafter "Plaintiff" and/or "Anwar") against MOVEMENT MORTGAGE LLC et al (hereinafter "Defendant" and or "MOVEMENT MORTGAGE"), for misconduct related to their origination and servicing of Plaintiffs' single family residential mortgage.

The Plaintiffs demands that their *pro se* be recognized and treated by this Chancery Court as the United States Supreme Court, US District Courts, and Georgia Supreme Court have held such status be recognized and treated. It is, by now, axiomatic that district courts have a special responsibility to construe *pro se* complaints liberally and to allow ample opportunity for amending the complaint when it appears that by so doing the *pro se* litigant would be able to state a meritorious claim. *See, e.g., Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981) (noting "well-established requirement that pro se pleadings be held to less stringent standards than those prepared by counsel"); *Munz v. Parr*, 758 F.2d 1254, 1258 (8th Cir. 1985) (*pro se* complaint is not frivolous unless it is "beyond doubt that petitioner can prove no set of facts in support of his claim which would entitle him to relief"); *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987) ("*pro se* litigant must be given leave to amend his or her complaint unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment"); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (less stringent standards for *pro se* complaint).

Not only is the district court to view the *pro se* complaint with an understanding eye, but, while the court is not to become an advocate, it is incumbent on it to take appropriate measures to permit the adjudication of *pro se* claims on the merits, rather than to order their dismissal on technical grounds. Indeed, it is the "well-established duty of the trial court to ensure that the claims of a *pro se* litigants are given a fair and meaningful consideration." *Palmer v. City of Decatur*, 814 F.2d 426, 428-29 (7th Cir. 1987) (citations omitted).

1  As described in the allegations below, Defendant's misconduct resulted in the issuance of an improper mortgage, premature and unauthorized foreclosure, violation of Plaintiffs' homeowners' rights and protections, the use of false and deceptive affidavits and other documents. Each of the allegations regarding Defendant contained herein applies to instances in which the defendant engaged in the conduct alleged.

## THE PARTIES

This action concerns certain real property, of which, Plaintiff, Anwar Aalaam, a married man, residing in the State of North Carolina, County of Iredell, and *inter alia*, are the purchasers of certain real property located at **100 Brookmeade Dr., Statesville, NC [28625] supra.**

Defendant, "Lender" MOVEMENT MORTGAGE, LLC is a diversified financial services company. It is a Delaware corporation, headquartered in Wilmington, Delaware. Defendant Assoc. ("MOVEMENT MORTGAGE, LLC"), is a National Banking Association. The Defendant identified in this paragraph are referred to here as "MOVEMENT MORTGAGE, LLC", and are lenders and servicers, which regularly engage in business in the State of North Carolina and who regularly provide mortgage loans and related services to residents in the State of North Carolina. U.S. BANK NATIONAL ASSOCIATION is named as Trustee. Guarantor – Government National Mortgage Association, Trust name – Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2021-154 with a closing date of September 30, 2021. The Promissory Note of Anwar A. Aalaam dated August 13, 2021, regarding a loan for $373,000.00, buy the Original Lender of the August 13, 2021 Aalaam/Osborne loan is Movement Mortgage, LLC, [The signed Note is NOT indorsed]: Deed of Trust of Anwar A. Aalaam dated August 13, 2021 and filed in the Official Records of the Iredell Register of Deed's Office on August 13, 2021 as ins# BK: 2841 PG: 1453-1468.

## JURISDICTION AND VENUE

This Chancery Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 because the action arises under the laws of the United States, and pursuant to 28 U.S.C § 1332(a)(1) as there exists diversity of all parties and the amount in controversy exceeds $75,000. The Defendant has sufficient contacts with North Carolina as they service and foreclose on numerous loans in the state. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) and 31 U.S.C § 3732(a). This Honorable court maintains venue and subject matter jurisdiction minus the *Rooker-Feldman doctrine*. "*The Rooker-Feldman doctrine merely recognizes that 28 U.S.C. § 1331[, which provides that federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States,"] is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme] Court, see [28 U.S.C.] § 1257(a)." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n. 3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (holding that the *Rooker-Feldman doctrine* does not apply to a suit seeking review of state agency action).

## RULE OF LAW

Whereby this cause, being a complaint in exclusive equity jurisdiction, (as it directly involves the property/estate/securities of the plaintiffs), cites the rule of law as follows upon: "Equity having power and the court having jurisdiction, decrees can conform to the exigencies of the suits and award appropriate relief under the complainant's general prayer." *United States v. Cooper*, 217 F. 846, 847 (D. Mont. 1914). "While a court of equity, having once obtained jurisdiction of a cause, will retain it for all purposes and administer complete relief, yet in order to authorize relief which can be obtained in a suit at law, there must be some substantial ground of equitable jurisdiction both alleged and proven; otherwise, a court of equity will not retain jurisdiction and grant a purely legal remedy". *Gentry-Futch Company v. Gentry*, 90 Fla. 595, 106 So. 473; *See also* 10 R. C. L. 370 to 372. "The suit is brought for special relief, and the judgment required to be entered is such as a court exercising jurisdiction in equity alone could

- 4 -
ANWAR AALAAM ORIGINAL COMPLAINT
Case 5:24-cv-00127-KDB-DCK   Document 1   Filed 05/20/24   Page 4 of 19

render." *Shoshone Min. Co. v. Rutter*, 87 F. 801, 804 (9th Cir. 1898). "[W]here . . . the equitable jurisdiction of the court has properly been invoked . . . the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law." *Porter v. Warner Holding Co.*, 328 U.S. 395, 399, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332 (1946).

## BACKGROUND FACTS

Plaintiffs files their complaint so that they meet the burden of Proof and Stating a Claim upon which relief can be granted. Plaintiff conducted extensive research with the aid of private Forensic Audit as an expert witness in support of this complaint. Plaintiff presents a multi-pronged complaint consisting primarily of contract breach and gross negligence in regard to chain of title and forgery. Plaintiffs states their claim as follows:

<u>The Single-Family Mortgage Industry</u>

The single-family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one- to four-family dwellings. Mortgage origination is the process whereby a lender <u>loans money</u> to a borrower and receives a security interest in property, through a mortgage or comparable device that secures the loan. Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds. For more than forty years, mortgages have been "pooled" to create an investment vehicle or special purpose vehicle ("SPV"), often denominated as a trust, and interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.

After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagor; applying payments made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when

- 5 -
ANWAR AALAAM ORIGINAL COMPLAINT
Case 5:24-cv-00127-KDB-DCK   Document 1   Filed 05/20/24   Page 5 of 19

mortgagors fail to do so; pursuing collections from delinquent mortgagors; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments. To stay within the guidelines of the Fed. R. C. Procedure Rule 8, plaintiff will give a short and brief description of the misconduct.

The property is located at 100 Brookmeade Dr, Statesville, NC 28625. These documents have been obtained from the Iredell Register of Deed's Office and from Movement Mortgage LLC. Those documents are as follows:

| Exhibit | Document Name | Date Recorded | Document Number |
|---|---|---|---|
| A | Note Received from Movement Mortgage LLC on March 03, 2024 | - Not Recorded - | 3538483 |
| B | Deed of Trust | August 13, 2021 | BK: 2841 PG: 1453-1468 |
| C | Voluntary Liens Report | -Not Recorded- | |
| D | Pages 1-11 of Offering Circular Supplement GNMA 2021-154 | -Not Recorded- | |

On March 04, 2024, the Anwar A. Aalaam payment stream (The Debt) was identified in the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2021-154 ("GNMA 2021-154 Trust") This trust is a Special Purpose Vehicle (SPV) which was created for the purpose of issuing mortgage-backed securities.

The returns that are paid on the mortgage-backed securities are derived from "slices" ("tranches") of the pool of comingled payments. "Pooling" (commingling) these trust assets to back financial instruments purportedly serve as the foundation for the instruments (as "securities") being offered and sold to secondary-market investors, in the process known as "securitization." the evidence shows that the Anwar A. Aalaam payment stream (The Debt) is currently in the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2021-154 as shown by the information below, as of March 04, 2024. The Loan Level Data information for the Anwar A. Aalaam loan below was obtained from the Ginnie Mae Enterprise Online Portal by an independent third party who specializes in locating Residential

Mortgage-Backed Securities, (RMBS), and VA, FHA and GSE loans (Housing Mortgage Consultants), William McCaffrey on March 04, 2024.

**Search Results:** – Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2021-154

**Trust Closing date:** September 30, 2021.

This is the last date in which assets may be placed into the trust.

1|905429864|N|3538483|RETAIL|MOVEMENT MORTGAGE LLC|SERVICEMAC LLC|3.000|3.000|3.250|000373000.00| 000373000.00|360|10/2021||360|09/2051|095|095|01|||NO |PURCHASE|SF||PRIMARY||NC|28625 |FIXED| |NO | 1572.58 | P|18-18-6-1386193 ||GINNIE MAE REMIC TRUST 2021-154

"Loan Level Data" refers to specific loan characteristics of the loan. Examples of different types of specific data types would be "Loan number," "Original Balance," "Maturity Date," "Property State," "Property Zip Code," "Property City," "Pool Number," and many more.

## I. FIRST CAUSE OF ACTION
### FRAUD IN THE FACTUM PER UCC § 3-305(a)(1)(iii)

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that the Defendant has violated North Carolina code – General Statutes § 96-18 more specifically referred to as fraud in the factum (fraud in the execution), *i.e.*, "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley v. FDIC*, 484 U.S. at 93-94. Plaintiffs assert that such fraud "render[s] the instrument entirely void, thus leaving no right, title or interest that could be diminished or defeated." *Id.* (citations omitted). Plaintiffs have it on good authority that the Defendant never "loaned" the Plaintiff anything, yet through a clever book-entry swap, simply loaned (returned) the value of the note created by the Plaintiffs back as a loan that was to be repaid. *See* 12 U.S.C § 83. Defendant is required to adhere to the Generally Accepted Accounting Principles (GAAP). GAAP follows an accounting convention that lies at the heart of

the double-entry bookkeeping system called the Matching Principle. The principle works as follows:

When a bank accepts bullion, coin, currency, checks, drafts, promissory notes, or any other similar instruments (hereinafter "instruments") from customers and deposits or records the instruments as assets, it must record offsetting liabilities that match the assets that it accepted from customers. The liabilities represent the amounts that the bank owes the customers, funds accepted from customers. In a fractional reserve banking system like the United States banking system, most of the funds advanced to borrowers (assets of the banks) <u>are created by the banks themselves</u> and are not mere transferred from one set of depositors to another set of borrowers.

According to Generally Accepted Accounting Principles ("GAAP") and Federal Reserve Publications, two loans were exchanged. The Plaintiff and Defendant exchanged reciprocal credits involving money of account and not money of exchange; no lawful money was or probably ever would be disbursed by either side in the covered transaction. The loan from the Plaintiffs to the bank is the deposit of the promissory note. Plaintiffs assert that adequate assurance of due performance that the Defendant purchased the note from the Plaintiffs and did not deposit the note was not given.

If the Defendant deposited the note, per 12 U.S.C. 1813, the Defendant was required to give a deposit receipt. GAAP requires that a bank "match" a new bank liability with the Plaintiffs name on it showing that the bank owes the Plaintiffs for the deposit they accepted from the Plaintiffs just as, in the regular course of business, when deposits of cash into a checking account are made. Plaintiffs concede that while it is true that the mere fact that a company's financial reporting is inaccurate does not establish *scienter, see Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996); *In re General Electric Securities Lit.*, No. 94-C-4024, 1995 WL 590639, at *4, (S.D.N.Y. Oct.4, 1995), aff'd, *Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996), the magnitude of reporting errors may lend weight to allegations of recklessness where Defendant was in a position to detect them. It is sufficiently pled if the complaint "afford[s] a basis for believing that plaintiffs could prove scienter." *DiLeo*, 901 F.2d at

629. *Scienter*, or the intent to defraud, is an essential element of every 10b-5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Unlike the factual circumstances constituting the fraud, a defendant's fraudulent intent may be averred generally. Fed.R.Civ.P. 9(b); Reshal, 754 F.Supp. at 1235.

*"Of course, they [BANKS] do not really pay out loans from the money they receive as deposits. If they did this, no additional money would be created. What they do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts. Loans (assets) and deposits (liabilities) both rise... Reserves are unchanged by the loan transactions. But the deposit credits constitute new additions to the total deposits of the banking system."*

*"[T]he bank creates new money as loans are granted; The bank records the promissory note as a bank asset which is offset by a new bank liability called the borrower's transaction account (which is commonly called a checking account).* Federal Bank of Chicago, *Modern Money Mechanics pg.5, Anne Marie L. Gonczy* et al. eds., (1994)(emphasis added). This publication goes on to say, "Any deposit received is new money, regardless of its ultimate source." *Id.* p.7. The publication from the Federal Reserve of Texas reiterates this point by stating, "Banks actually create money when they lend it...Most of a bank's loans are made to its own customers and are deposited in their checking accounts."

*Black's Law Dictionary,* Tenth Edition explains a deposit as follows:

> ***deposit***, n. (17c) **1.** The act of giving money or other property to another who promises to preserve it or to use it and return it in kind; esp. the act of placing money in a bank for safety and convenience. - Also termed (when made at a bank) *bank deposit.* **2.** The money or property so given.
>
> BLACK'S LAW DICTIONARY, 533 (Bryan A. Garner et al. eds., 10th ed.2014)

Under Title 12 U.S.C 1913(L)(1) when Plaintiffs deposited their note, it became a cash item. It became the equivalent of cash. The Plaintiffs allege they are the creditor on the payables side of the ledger for the Defendant. By depositing the Note (an asset of the originators/ makers of the note) by the Defendant, the loan, which had not yet been advanced to mortgagors by the mortgage company, was paid therefore there cannot be a "holder-in-due- course" of the Note if it

- 9 -
ANWAR AALAAM ORIGINAL COMPLAINT
Case 5:24-cv-00127-KDB-DCK   Document 1   Filed 05/20/24   Page 9 of 19

has already been paid. To be a "holder-in-due- course" of the note, the note must be held by the lender until the note is paid off by the borrower and returned to the borrower. Depositing the note, in effect, cancels the note because the lender has just been paid (cash receipts for the deposit) and no "receipt" for the deposit was ever given to the borrower. The Defendant must follow GAAP, as do all banks, and show a corresponding "liability" for the "asset" (note) they deposited. That liability is money the Defendant OWES to Plaintiffs for their asset that was deposited. Banks are "creating" money based on a borrower's promise to repay, which, in turn, is often secured or backed by valuable items the borrower owns (collateral). *Id.* Defendant is unable to loan funds from other depositors per Federal Reserve Publications, (*Modern Money Mechanics, Supra* at para 6, pg. 5), this much is clear. *See also "A national bank has no power to lend its credit to any person or corporation". Bowen v. Needles Nat. Bank*, 94 F 925, 36 CCA 553, certiorari denied in 20 S.Ct 1024, 176 US 682, 44 LED 637. Money, (or its equivalent) must first be deposited in order to be loaned. This was not relayed to the Plaintiffs in any cognizable manner.

Although allegations of GAAP violations, standing alone, are insufficient to raise a strong inference of *scienter*, GAAP violations may support the inference when coupled with additional circumstances, such as the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information. *Takara Trust v. Molex, Inc.*, 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) (citing *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)). This Chancery Court may additionally consider the "identification of the specific transactions alleged to have violated GAAP and the amount of detail provided in explaining those transactions." *Takara Trust*, 429 F. Supp. 2d at 980-81 (*citing Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1104 (10th Cir. 2003)). In the case at bar, the Defendant violated Banking Law pertaining to GAAP as is required for all FDIC insured institutions. See 12 U.S.C 1831n (2)(A) Courts have held that significant overstatements of revenue tend to support the conclusion that the Defendant acted with scienter. *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1255 (N.D. Ill. 1997). The actions alleged herein are at best deceptive and at worse fraud in its highest form. Plaintiffs

believe borrowers should repay all lenders. Defendant cannot violate the law, contracts or GAAP, the use of deception renders this contact *ultra vires* - void.

## II. SECOND CAUSE OF ACTION
## UNCONSCIONABLE CONTRACT PER UCC§2-302

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that the mortgage agreement is substantively unconscionable for three reasons: 1.Gross inadequacy of consideration 2.Unequal bargaining power 3.Negligent misrepresentation. The plaintiff argues that the contract is invalid because it is an unconscionable adhesion contract. An adhesion contract is defined as a "standardized contract form offered . . . on essentially [a] `take it or leave it' basis. . . . [leaving the] weaker party . . . no realistic choice as to its terms." *State ex rel. Saylor v. Wilkes*, 2005 W. Va. LEXIS 32, at *21-22 (quoting Black's Law Dictionary 40 (6th ed. West 1990)).

Typically, contracts of adhesion appear in consumer contract disputes in which the consumer signs a standard-form contract without the ability to negotiate about its terms. See Walther v. Sovereign Bank, 386 Md. 412, 430 (2005). Under North Carolina Law, an unconscionable contract is void. *Id.* In order to establish unconscionability, a party must demonstrate both procedural and substantive unconscionability. Id. at 743–44. The Defendants blatant lack of consideration and flagrant disregard for proper assignment of the note is a staple of the character of mortgage as a whole. Procedural unconscionability is evidenced by "one party's lack of meaningful choice." *Id.* at 743 (citing Black's Law Dictionary 1560 (8th ed. 2004)). Substantive unconscionability is evidenced by "contractual terms that unreasonably favor the other party."*Id. (See also Rite Color Chem. Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 19-20, 411 S.E.2d 645, 648-49 (1992)). Plaintiffs assert that a meaningful choice was not had as the prima facie contract was worded with intent to mislead and encumber. Contracts of adhesion that are "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it basis' " are procedurally unconscionable. *Id.* at 746. But "[t]he fact that a contract is one of adhesion does not mean that either it or any of its terms are invalid or unenforceable." *Meyer*

*v. State Farm Fire & Cas. Co.*, 85 Md.App. 83, 582 A.2d 275, 278 (Md. Ct. Spec. App. 1990). Instead, a contract of adhesion will be held invalid only if it is also substantively unconscionable. *Walther*, 872 A.2d at 746–47. The court must examine the contract with "special care" and examine "the substance of the particular provision at issue ... to decide whether it is unconscionable." *Id.* A contract is deemed unconscionable if the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981). The "loan" for all intents and purposes can be classified as an unconscionable contract per N.C. Gen. Stat. § 25-2-302.

The Defendant changed the economic substance of the transaction from that contemplated in the application form, agreement, note(s) or other similar instrument(s) that the Plaintiffs executed, thereby changing the costs and risks to the Plaintiffs. at most, the Defendant extended its own credit (money of account), but the Plaintiffs were required to "repay" in money (money of exchange, and lawful money at that), which creates at least the inference of inequality of obligations on the two sides of the transaction (money, including lawful money, is to be exchanged for bank credit). Defendants undoubtedly assert that Plaintiff signed a promise to pay, such as a note(s) or credit application (collectively, the "Note"), in exchange for the Defendants advance of funds, credit, or some type of money to or on behalf of Plaintiffs.

However, the bookkeeping entries required by application of GAAP and the Federal Reserve's own writings should trigger close scrutiny of Defendants apparent assertions that it lent its funds, credit, or money to or on behalf of the Defendant, thereby causing them to owe Defendant $373,000.00 plus interest. According to the bookkeeping entries shown or otherwise described to me and application of GAAP, the Plaintiffs were to tender some form of "money" ("lawful money of the United States of America" is the type of money explicitly called for in the Note"), securities or other capital equivalent to money, funds, credit, or something else of value in exchange (money of exchange, loosely defined), collectively referred to herein as "money", to repay what the Plaintiff claims was the money lent to the Plaintiffs. To delve further with

specificity and particularity, it is helpful to review a modern Federal Reserve description of a bank's lending process. *See, David H. Friedman*, MONEY AND BANKING (5th ed. 2006):

> *"The commercial bank lending process is similar to that of a thrift in that the receipt of cash from depositors increases both its assets and its deposit liabilities, which enables it to make additional loans and investments... [W]hen a commercial bank makes a loan, it accepts as an asset the borrower's debt obligation ( the promise to repay) and creates a liability on its books in the form of a demand deposit in the amount of the loan."*

Therefore, the bank's original bookkeeping entry should show an increase in the amount of the asset credited on the asset side of its books and a corresponding increase equal to the value of the asset on the liability side of its books. This would show that the bank received the customer's signed promise to repay as an asset, thus monetizing the customer's signature and creating on its books a liability in the form of a demand deposit or other demand liability as stated previously. The Defendant, in the normal course of business, holds this demand deposit in a transaction account on behalf of the Plaintiffs. Instead of the bank lending its money or other assets to the customer, as the Plaintiffs reasonably concluded from the wording from the face of the note, the Defendant created funds for the Plaintiffs transaction account without the Plaintiffs' permission, authorization, or knowledge and delivered the credit on its own books representing those funds to the Plaintiffs, meanwhile alleging that the Defendant lent the Plaintiffs money. *See, Thomas P. Fitch*, BARRON'S BUSINESS GUIDE DICTIONARY OF BANKING TERMS, "credit banking," 3.

"Bookkeeping entry representing a deposit of funds into an account."

But Defendants loan agreement apparently avoids claiming that the bank actually lent the Plaintiffs money. Defendant states in the agreement that the Plaintiffs are obligated to repay Defendants principal and interest for the "Valuable consideration (money) the Defendant gave the Plaintiffs (borrower)." The loan agreement and note still delete any reference to the Defendants receipt of actual cash value from the Plaintiffs and exchange of that receipt for actual cash value that the Defendant banker returned. The bookkeeping entries tend to prove that the

Defendants accept cash, checks, drafts, and promissory notes/credit agreements (assets) as money deposited to create credit or checkbook money that are bank liabilities, which shows that, absent any right of set-off, Defendants owe money to the persons who deposit money. Cash (money of exchange) is money, and credit or promissory notes (money of account) become money when banks deposit promissory notes with the intent of treating them like deposits of cash. *See*, 12 U.S.C. § 1813 (I)(1) (definition of "deposit" under Federal Deposit Insurance Act).

When the Defendants enact the foregoing, then in that even, there is an utter failure of consideration for the "loan contract". The Defendants are trying to use the credit application form or the Note to persuade and deceive the Plaintiffs into believing that the opposite occurred and that the Plaintiffs were the borrower and not the lender. The following point is undisputed: The Plaintiffs' loan of their credit to Defendants, when issued and paid from their deposit or credit account at Defendants became money in the Federal Reserve System (subject to a reduction of up to ten percent for reserve requirements) as the newly issued credit was paid pursuant to written orders, including checks and wire transfers, to sellers of goods and services for the account of Plaintiffs. Based on the foregoing, Defendants are using the Plaintiffs note for its own purposes, and it remains to be proven whether Defendant has incurred any financial loss or actual damages. In any case, the inclusion of the "lawful money" language in the repayment clause of the note is confusing at best and in fact misleading in the context described above. The fact that events transpired later on that provided the Defendant with more of an extreme benefit than the Plantiffs is irrelevant, and does not make for an unconscionable contract. Unconscionability existed at the *ab initio* and thus must be declared void.

### III. THIRD CAUSE OF ACTION
### CONVERSION PER UCC § 3-420

Plaintiffs re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein. Conversion is an intentional tort that evolved to protect against interference with possessory and ownership interests in personal property. In order to recover for conversion in North Carolina, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for

- 14 -

ANWAR AALAAM ORIGINAL COMPLAINT
Case 5:24-cv-00127-KDB-DCK   Document 1   Filed 05/20/24   Page 14 of 19

possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill.2d 109, 234 Ill. Dec. 455, 703 N.E.2d 67, 70 (1998). In diversity cases, this Chancery Court must apply the substantive law of the state in which the district court sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Defendants here are committing acts that will result in foreclosure and are of such nature to cause an actual interference with the Plaintiffs' ownership or right to possess the subject property. The fraudulent acts associated with the Plaintiffs' Loan and Deed, show an intention or purpose to convert the property, so that the Defendants could exercise ownership over it, and/or to remove the property from Plaintiffs' ownership.

Defendants knowingly, willingly, wantonly, and with malicious intent, misled the Plaintiffs' in the true purpose of the purported "Loan" and thereby intended to convert the property by taking possession of it.

## IV. FOURTH CAUSE OF ACTION
## RECOUPMENT AND DISGORGEMENT OF WRONGFUL GAINS PER UCC § 3-305(3)

Plaintiff re-alleges and incorporate herein by reference all previous paragraphs as though fully set forth herein. The Defendant is mandated by Title 12 U.S.C to follow Generally Accepted Accounting Principles ("GAAP") which are a set standardized accounting rules, requirements, and practices established by the Financial Accounting Standards Board ("FASB"). GAAP violations, standing alone, are insufficient to create an inference of fraud. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996) (failure to follow GAAP, without more, does not establish scienter); *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 553 (6th Cir. 1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."); *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir. 1994) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1384 (N.D. Ga. 2004). However, violations of GAAP, when coupled with other evidence of fraud, can

create a strong inference of scienter. See, e.g., *In re Scientific-Atlanta, Inc. Securities Litigation*, 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002) ("Scientific-Atlanta I"); *In re World Access, Inc. Securities 6 Litigation*, 119 F. Supp. 2d 1348, 1356 (N.D.Ga. 2000). For example, alleged GAAP violations combined with a profound overstatement of financial results of a company may establish severe recklessness. *Carley Capital Group v. Deloitte Touche*, L.L.P., 27 F.Supp. 2d 1324, 1339-40 (N.D. Ga. 1998); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997). The issuance of a restatement may also contribute to the establishment of scienter. Where the "number, size, timing, nature, frequency, and context of the [GAAP violations] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000); see, e.g., *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 322-23 (D.R.I.2004); *In re Hayes Lemmerz Intern., Inc. Equity Securities Litigation*, 271 F. Supp. 2d 1007, 1018 (E.D. Mich. 2003). SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures. *See also Schultz v. Applica, Inc.*, 488 F. Supp.2d 1219, 1225 n.2 (S.D. Fla. 2007) (Dimitrouleas, J.) ("GAAP comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles . . . establish guidelines for measuring, recording, and classifying the transactions of a business entity.").

The equitable remedy of disgorgement is a "form of restitution measured by the defendant's wrongful gain." *Kokesh v. SEC*, 137 S. Ct. at 1640 (alteration, internal quotation marks, and citation omitted). Additionally, the recovery authorized with disgorgement is not "wholly disproportionate to the harm suffered," NEC, 11 F.3d at 137 (citation omitted), since a "court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing," *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). Under 12 U.S.C §§ 248,347, the defendant is required to file a balance sheet, a form FR2046, to the Federal Reserve Board. This balance sheet shows the assets and liabilities present in the quarterly accounting. The balance sheet, A 2046, 2049 AND 2099, have OMB numbers on them

that are subject to disclosure under the privacy act, 5 U.S.C 552(b)(4). The liability side of the ledger is where the Plaintiff's Note is. It is an asset to the Plaintiff but a liability to the Defendant. The Defendant has set aside funds belonging to the Plaintiff in an escrow account since the securitization of the note described above that they claim at the end of a 3 (three) year period as abandoned funds. The Plaintiff now demands them back. Under 12 U.S.C 1813(L)(1) When a promissory note is deposited it becomes "money or its equivalent". The Plaintiff is the creditor on the payable side of the Defendants ledger, and they are withholding funds as well as purporting, erroneously, to be holder in due course with all the rights therein. Plaintiff hereby demands that the Defendant show on their books that they are not doing offset entries. The reparation of funds caused by the defalcation and fraud of these defendants is required by natural justice and is within the equity power of this Court. In dealing with Plaintiff's prayer for disgorgement, this Court equates disgorgement with restitution and recoupment which are equity remedies of ancient origin. When congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes. There is inherent in courts of equity a jurisdiction to give effect to the policy of the legislature. *Mitchell v. DeMario Jewelry*, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

# PRAYER AND RELIEF

WHEREFORE, the Plaintiffs respectfully request that the judgment be entered in their favor and against the Defendant as follows:

1. On Count I,

   a) Judgement against the Defendant,

   c) An order requiring disgorgement of unlawful gains obtained by the Defendant as a result of their unlawful conduct;

   d) restitution or other remedial relief to compensate Plaintiffs of the Defendants unlawful conduct;

   e) civil penalties;

   f) and costs of investigation.

2. On Count II,

   a) judgement against the Defendant;

   b) an order requiring removal of cloud of title as a result of their unlawful conduct;

   c) restitution or other remedial relief to compensate Plaintiffs of the Defendant's unlawful conduct;

   d) civil penalties; and

   e) costs of investigation.

3. On Count III,

   a) Defendant return the GENUINE ORIGINAL PROMISSORY NOTE with a full disclosure of accounting of such to plaintiff forthwith;

   b) For damages as provided by statute;

   c) For a civil penalty and removal of cloud from Plaintiffs title,

   d) Such other relief as is in connection with each false entry or assignment, or such greater amount as provided by law;

   e) Any other relief that Plaintiff fails to realize, and/or that this Chancery Court deems fair and just under the circumstances.

4. On Count IV.

a) For an Order enjoining Defendant from continuing to violate the statues alleged herein;

b) Declaring that the trust deed is not a lien against the subject property, ordering the immediate release of the trust deed of record, and quieting the title to the subject properties in Plaintiffs and against Defendant and all claiming by, though, or under them;

DATED May 20, 2024

Respectfully submitted,

By: /s/

Anwar Aalaam, Pro Per
100 Brookmeade Dr.
Statesville, NC 28625